# EXHIBIT C

FILED
2/6/2025 5:34 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Cheryl Watts DEPUTY

CAUSE NO. DC-25-01992

| | | |
|---|---|---|
| **PROJECT LONESTAR, INC.** | § § § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| V. | § § | 160th  JUDICIAL DISTRICT |
| **AMERICAN DAIRY QUEEN CORPORATION,** | § § § | |
| *Defendant.* | § § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

**COMES NOW**, Project Lonestar, Inc. ("**Plaintiff**"), and files this *Plaintiff's Verified Petition and Application for Temporary Restraining Order* against American Dairy Queen Corporation ("**Defendant**"), and respectfully shows the following:

### I.
### DISCOVERY CONTROL PLAN AND CLAIM FOR RELIEF

1.      Plaintiff intends to conduct discovery under Level Three of the Discovery Control Plan prescribed by Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE. Plaintiff seeks monetary relief of at least $1,000,000.00 and non-monetary relief, pursuant to Rule 47(c)(4) of the TEXAS RULES OF CIVIL PROCEDURE. Plaintiff further demands judgment for all other relief to which it deems itself entitled, including temporary and permanent injunctive relief, reasonable and necessary attorneys' fees, interest, and costs of court as further alleged below.

### II.
### PARTIES

2.      Plaintiff Project Lonestar, Inc. ("**Plaintiff**") is foreign corporation having its principal place of business in Cheyenne, Wyoming.

3.      Defendant American Dairy Queen Corporation ("**Defendant**") is a foreign corporation having its state of incorporation in Delaware and having its principal place of business in Bloomington, Minnesota. Defendant may be served through its registered agent, C T Corporation System, at 1999 Bryan St., Ste. 900 Dallas, TX 75201 or wherever it may be found.

## III.
### VENUE AND JURISDICTION

4. Jurisdiction is proper in this Court as the damages sought by Plaintiff are within the jurisdictional limits of the Court. Venue is proper pursuant to Section 15.001 & 15.002 of the TEXAS CIVIL PRACTICE & REMEDIES CODE because Dallas County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

## IV.
### BACKGROUND FACTS

5. Plaintiff owns 38 Dairy Queen franchises across the State of Texas, which collectively employ nearly 500 individuals.

6. Defendant is the national franchisor of the Dairy Queen brand.

7. In August 2020, Plaintiff acquired the franchise rights to 38 Dairy Queen stores in the State of Texas from a Vasari, LLC, a Delaware limited liability company.

8. Plaintiff employs approximately 500 people at these restaurants.

9. In September 2024, Defendant sent notice to Plaintiff that it was going to terminate Plaintiff's franchises for not remodeling them. After discussions between the parties, Plaintiff and Defendant entered into an agreement under which Defendant would provide Plaintiff with time to locate a buyer for the stores (the "**Agreement**").

10. The Agreement was executed on September 24, 2024.

11. The Agreement provided Plaintiff with 30 days to identify a buyer.

12. The Agreement further provided that Defendant had 30 days to evaluate the buyer but that Defendant would not "unreasonably withhold its approval."

13. The Agreement further provided that, if Defendant did not approve a buyer, Plaintiff would have another 30 days to locate a substitute buyer, and Defendant would have another 30 days to evaluate the substitute buyer. The Agreement further provided Plaintiff with an opportunity to present a second substitute buyer.

14. The Agreement further provided that all transfer requirements needed to be complete within six months from the date that Defendant approved the prospective buyer.

15. On September 25, 2024, Plaintiff notified Defendant that it had located a buyer.

16. The same day, Defendant informed Plaintiff that certain transfer fees needed to be paid before Defendant could begin evaluating the proposed transfer.

17. While the Agreement mentioned that these fees may need to be paid before the

proposed transfer was finalized, it does not state that the fees needed to be paid before Defendant would begin the evaluation process; instead, this is referenced in the section discussing fully satisfying all transfer requirements—which needed to occur within six months after Defendant had approved the buyer.

18. In early October, as required by the Agreement, the buyer filled out an application to become a franchisee of Defendant. This triggered Defendant's 30-day period under the Agreement in which to determine whether the buyer met the qualifications for being a franchisee.

19. On November 6, 2024, Defendant again informed Plaintiff that it would not review the buyer's application until certain transfer fees were paid.

20. In or around the second week of November 2024, Plaintiff's prospective buyer paid the transfer fee to Defendant.

21. On November 15, 2024, Defendant still would not process the application, because Plaintiff fell behind on royalty payments around this time.

22. Between November 16 and 19, 2024, Defendant and Plaintiff's prospective buyer began holding discussions.

23. Upon information and belief, Defendant, itself or through an agent or representative, violated the Agreement's confidentiality provision, when it informed Plaintiff's prospective buyer of the existence of the Agreement and that Plaintiff needed to close on the sale to the prospective buyer, or else lose its rights in the franchises altogether. Upon information and belief, subsequent to the suspected breach of confidentiality referenced above, the prospective buyer reduced its offer to purchase the franchise rights by several million dollars.

24. On November 20, 2024, Plaintiff's prospective buyer approached Plaintiff about renegotiating the terms of the sale. Plaintiff and the prospective buyer reached an agreement to sell some of the stores.

25. Defendant was advised of the renegotiated deal between Plaintiff and the prospective buyer sometime the following week. Nevertheless, Defendant still refused to process the prospective buyer's application, based on Plaintiff briefly falling behind on royalty payments— which, under the Agreement, Plaintiff was required to start paying on a weekly basis.

26. By January 2025, Plaintiff believed it had caught up on royalty payments, but Defendant disputed this. After much back and forth, Defendant agreed that Plaintiff had caught up on the royalty payments, but the process for transferring the franchises to the prospective buyer

still did not move forward.

27. By letter dated January 30, 2025, Defendant informed Plaintiff that it had terminated 25 of Plaintiff's franchise agreements and demanded that Plaintiff comply with post-termination obligations.

28. Although Defendant's letter clearly stated that Plaintiff's "Agreements remain in effect for any other locations currently being operated under the Agreements or not included on the Exhibit [to the letter]," Defendant has instructed a key supplier that "all shipments of DQ products need to stop immediately."

29. All of Plaintiff's restaurants—including those which were not terminated—are therefore going to run out of food, beverage, and other restaurant supplies in the next one or two business days.

30. As a direct and foreseeable result of Defendant's actions and inaction, Plaintiff has been and will continue to be harmed. Through this action, Plaintiff seeks injunctive relief to remedy harms which are incapable of compensation by the award of money damages and to prevent further irreparable harm.

31. Plaintiff also seeks to recover actual, direct, economic, and non-economic damages from Defendant, as well as reimbursement of its reasonable and necessary attorneys' fees, expert fees, interest, and cost of court as further alleged below and as allowed by statute.

## V.
## COUNT ONE
## BREACH OF CONTRACT

32. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically alleged herein.

33. Plaintiff and Defendant entered into the Agreement that was contractual in nature and the parties had the mutual intent to be bound by its terms. This includes the terms relating to Plaintiff's rights to sell its franchise rights to a substitute buyer. Defendant breached its obligations to permit Plaintiff to sell its franchise rights to a substitute buyer by refusing or otherwise failing to process the prospective buyer's application.

34. Defendant further breached the Agreement by violating the confidentiality provisions contained therein. More specifically, Defendant violated said confidentiality provisions when it informed Plaintiff's prospective buyer of the existence of the Agreement and that Plaintiff needed to close on the sale to the prospective buyer, or else lose its rights in the franchises

altogether.

35. Defendant's violation of the confidentiality provisions referenced above include communications to the prospective buyer that alerted the prospective buyer that Plaintiff was under tight time constraints to close on a sale of the franchise. After learning about said time constraints, prospective buyer reduced its offer to purchase the franchise agreements by several million dollars.

36. Consequently, and as a direct result of Defendant's breach, Plaintiff has suffered actual, direct, economic, and non-economic damages of at least $4,000,000.00. Plaintiff further seeks injunctive relief and reimbursement of its reasonable and necessary attorneys' fees, litigation costs, and interest as allowed by statute and further alleged below.

## V.
### COUNT TWO
### DECLARATORY JUDGMENT

37. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically alleged herein.

38. Plaintiff seeks a declaratory judgment from this Court that it is entitled under the Agreement to continue operation of the Dairy Queen locations presently operated by Plaintiff.

39. Through this cause of action, Plaintiff seeks an award of "costs and reasonable and necessary attorney's fees as are equitable and just," pursuant to Tex. Civ. Prac. & Rem. Code § 37.009.

## VI.
### COUNT THREE
### TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE BUSINESS RELATIONSHIP

40. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically alleged herein.

41. Plaintiff entered into a valid contract with a prospective buyer for sale of Plaintiff's franchise rights to the prospective buyer.

42. Defendant interfered by Plaintiff's contract with the prospective buyer when Defendant violated the confidentiality provisions of the Agreement when Defendant informed Plaintiff's prospective buyer of the existence of the Agreement and that Plaintiff needed to close on the sale to the prospective buyer, or else lose its rights in the franchises altogether. Defendant further interfered with said contract when Defendant refused to process

43. Defendant's breach of the confidentiality provisions referenced above include communications to the prospective buyer that alerted the prospective buyer that Plaintiff was under

tight time constraints to close on a sale of the franchise. After learning about said time constraints, prospective buyer reduced its offer to purchase the franchise agreements by several million dollars. Defendant's refusal to process the sale application further caused Plaintiff damages by preventing the Plaintiff's sale of the franchise rights outright. Accordingly, Defendant's interference was the actual and proximate cause of Plaintiff's damages of at least $4,000,000.00.

## VII.
### APPLICATION FOR TEMPORARY RESTRAINING ORDER

44. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically set forth herein.

45. Plaintiff seeks a temporary restraining order and temporary injunction against Defendant to require them to:

   a. Cease from interfering in any way with the ability of any vendors or suppliers from providing food, beverage, and other restaurant supplies to the Dairy Queen locations operated by Plaintiff.

   b. Cease from terminating any of Plaintiff's franchise agreements.

   c. Refrain from taking any action to close and/or halt operation of the Dairy Queen locations operated by Plaintiff.

   d. Refrain from taking any action to interfere with Plaintiff's ability to operate the Dairy Queen locations operated by Plaintiff.

   e. Refrain from disclosing any details pertaining to any agreements entered into between Plaintiff and Defendant.

   f. Refrain from taking any action to sell or effectuate the sale of the franchise rights currently owned by the Plaintiff.

46. If Plaintiff's application is not granted, harm is imminent because Plaintiff has no ability to prevent Defendant from interfering with its business operations and cutting off access to food, beverage, and other restaurant supplies prior to Defendant being served in this matter.

47. There is no adequate remedy at law or equity that will prevent the immediate, ongoing and irreparable harm and injury Defendant is causing to Plaintiff.

48. The harm that will result if a TRO is not issued is irreparable because Defendant's continued communications with customers and personnel of customers will undoubtedly damage Plaintiff through the loss of customers, loss of good will, and permanent injury to Plaintiff's

business reputation.

49. Should Plaintiff have to sue to recover damages and injunctive relief beyond this application, there is a more than a likelihood of success on the merits.

50. Plaintiff requests that a bond be waived in this matter, or in the alternative the bond amount be no more than $250.00.

## VIII.
### REQUEST FOR TEMPORARY INJUNCTION

51. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically set forth herein.

52. Plaintiff requests that the Court set its application for temporary injunction for a hearing, and, after hearing the application, issue a temporary injunction against Defendant to preserve the status quo of Plaintiff during the pendency of this lawsuit.

## IX.
### REQUEST FOR PERMANENT INJUNCTION

53. All factual allegations set forth elsewhere in this Petition are incorporated by reference in support of this cause of action as if specifically set forth herein.

54. Plaintiff further asks the Court to set its request for a permanent injunction for a full trial, and, after the trial, issue a permanent injunction against Defendant.

## X.
### EVIDENCE IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND APPLICATION FOR TEMPORARY INJUNCTION

55. Plaintiff's supporting Affidavit and exhibits, which prove the allegations in this application for injunctive relief, are attached as exhibits herein and are incorporated by reference.

## XI.
### CONDITIONS PRECEDENT

56. All conditions precedent for Plaintiff to bring and file these claims against Defendant have been performed, have occurred, or have been waived or excused.

## XII.
### ATTORNEYS' FEES

57. Plaintiff retained Lovein Ribman, P.C., licensed attorneys, to represent it in pursuing its claims against Defendant. Pursuant to the TEXAS CIVIL PRACTICE & REMEDIES CODE, Section 38.001 *et seq.*, the Uniform Declaratory Judgments Act, all other applicable statutes, and the common law, Plaintiff is entitled to recover their costs and reasonable attorneys' fees, as are equitable

and just. A fee which Plaintiff believes to be in the sum of at least $50,000.00 if this cause requires a trial; an additional fee in the event of an appeal of this cause to the Texas Court of Appeals in the sum of at least $20,000.00; an additional fee in the event a petition for writ of error to the Texas Supreme Court is filed in the sum of at least $10,000.00; and an additional fee of $10,000.00 in the event such petition is granted.

## XIII.
### INTEREST

58. Plaintiff is entitled to and seek recovery of prejudgment interest at the highest rate allowed by law. Further, Plaintiff would show that if it is allowed to recover under any theory in this cause, then it is entitled to post-judgment interest at the highest rate allowed by law from the date of judgment until the satisfaction of same.

## XIV.
### PRAYER

59. Plaintiff prays that Defendant be cited to appear and answer, and that Plaintiff be granted an award against Defendant for each of the following:

    a. Upon any of the theories, actions, or causes of action or accounts pleaded above against Defendant and for judgment against Defendant for all relief enumerated (whether generally or specifically) in this Petition and prayer, to include injunctive relief, and all actual damages, including direct and consequential, and economic and noneconomic damages;

    b. Plaintiff's reasonable attorneys' fees, expert fees, and all recoverable costs as permitted by contract or statute;

    c. all prejudgment interest to which Plaintiff is entitled at the highest rate allowed by law;

    d. all post-judgment interest to which Plaintiff is entitled at the highest rate allowed by law;

    e. all costs of court;

    f. such orders and judgments affecting the obligations of Defendant and the rights of Plaintiff as this Honorable Court may find appropriate under the circumstances; and

    g. such other relief, both general and special, at law or in equity, to which Plaintiff may show itself justly entitled.

LOVEIN | RIBMAN, P.C.

By: /s/ David McDevitt
 David McDevitt
 State Bar No. 24117433
 dmcdevitt@loveinribman.com

1225 Main St., Suite 200
Grapevine, Texas 76051
(817) 442-5106 (Telephone)
(817) 442-5108 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## LOCAL RULE 1.06 CERTIFICATION

I hereby certify that, to the best of my knowledge, this case is not subject to transfer under Local Rule 1.06.

By: /s/ David McDevitt
 David McDevitt

## LOCAL RULE 2.02(b) CERTIFICATION

I hereby certify that irreparable harm is imminent and there is insufficient time to notify the opposing party or counsel.

By: /s/ David McDevitt
 David McDevitt

CAUSE NO. _____

| | | |
|---|---|---|
| PROJECT LONESTAR, INC. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| V. | § | ____ JUDICIAL DISTRICT |
| | § | |
| AMERICAN DAIRY QUEEN | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

### AFFIDAVIT OF MICHAEL NAKLEH IN SUPPORT OF PLAINTIFF'S VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

I, Michael Nakleh, declare the following under the penalty of perjury:

1. I am over the age of 18 years and am fully competent and able to make this affidavit.

2. I make this affidavit in support of *Plaintiff's Verified Petition and Application for Temporary Restraining Order* being filed by Project Lonestar, Inc. ("**Plaintiff**") against American Dairy Queen Corporation ("**Defendant**") in the above-numbered and styled lawsuit.

3. I have personal knowledge of the facts stated herein, and I hereby swear that they are true and correct.

4. Plaintiff is a Wyoming corporation whose shares are owned by Elite Restaurant Group, Inc., a Wyoming corporation whose shares are owned by Elite Limited, a Wyoming corporation whose shares are owned by me.

5. In August 2020, Plaintiff acquired the franchise rights to 38 Dairy Queen stores in the State of Texas from a Vasari, LLC, a Delaware limited liability company.

6. Plaintiff employs approximately 500 people at these restaurants.

7. In September 2024, Defendant sent notice to Plaintiff that it was going to terminate Plaintiff's franchises for not remodeling them. After discussions between the parties, Plaintiff and Defendant entered into an agreement under which Defendant would provide Plaintiff with time to locate a buyer for the stores (the "Agreement").

8. The Agreement was executed on September 24, 2024.

9. The Agreement provided Plaintiff with 30 days to identify a buyer.

10. The Agreement further provided that Defendant had 30 days to evaluate the buyer but that Defendant would not "unreasonably withhold its approval."

11. The Agreement further provided that, if Defendant did not approve a buyer, Plaintiff would have another 30 days to locate a substitute buyer, and Defendant would have another 30 days to evaluate the substitute buyer. The Agreement further provided Plaintiff with an opportunity to present a second substitute buyer.

12. The Agreement further provided that all transfer requirements needed to be complete within six months from the date that Defendant approved the prospective buyer.

13. On September 25, 2024, Plaintiff notified Defendant that it had located a buyer.

14. The same day, Defendant informed Plaintiff that certain transfer fees needed to be paid before Defendant could begin evaluating the proposed transfer.

15. While the Agreement mentioned that these fees may need to be paid before the proposed transfer was finalized, it does not state that the fees needed to be paid before Defendant would begin the evaluation process; instead, this is referenced in the section discussing fully satisfying all transfer requirements—which needed to occur within six months after Defendant had approved the buyer.

16. In early October, as required by the Agreement, the buyer filled out an application to become a franchisee of Defendant. This triggered Defendant's 30-day period under the Agreement in which to determine whether the buyer met the qualifications for being a franchisee.

17. On November 6, 2024, Defendant again informed Plaintiff that it would not review the buyer's application until certain transfer fees were paid.

18. In or around the second week of November 2024, Plaintiff's prospective buyer paid the transfer fee to Defendant.

19. On November 15, 2024, Defendant still would not process the application, because Plaintiff fell behind on royalty payments around this time.

20. Between November 16 and 19, 2024, Defendant and Plaintiff's prospective buyer began holding discussions.

21. Upon information and belief, Defendant, itself or through an agent or representative, violated the Agreement's confidentiality provision, when it informed Plaintiff's prospective buyer of the existence of the Agreement and that Plaintiff needed to close on the sale

to the prospective buyer, or else lose its rights in the franchises altogether. Upon information and belief, subsequent to the suspected breach of confidentiality referenced above, the prospective buyer reduced its offer to purchase the franchise rights by several million dollars.

22. On November 20, 2024, Plaintiff's prospective buyer approached Plaintiff about renegotiating the terms of the sale. Plaintiff and the prospective buyer reached an agreement to sell some of the stores.

23. Defendant was advised of the renegotiated deal between Plaintiff and the prospective buyer sometime the following week. Nevertheless, Defendant still refused to process the prospective buyer's application, based on Plaintiff briefly falling behind on royalty payments—which, under the Agreement, Plaintiff was required to start paying on a weekly basis.

24. By January 2025, Plaintiff believed it had caught up on royalty payments, but Defendant disputed this. After much back and forth, Defendant agreed that Plaintiff had caught up on the royalty payments, but the process for transferring the franchises to the prospective buyer still did not move forward.

25. By letter dated January 30, 2025, Defendant informed Plaintiff that it had terminated 25 of Plaintiff's franchise agreements and demanded that Plaintiff comply with post-termination obligations.

26. Although Defendant's letter clearly stated that Plaintiff's "Agreements remain in effect for any other locations currently being operated under the Agreements or not included on the Exhibit [to the letter]," Defendant has instructed a key supplier that "all shipments of DQ products need to stop immediately."

27. All of Plaintiff's restaurants—including those which were not terminated—are therefore going to run out of food, beverage, and other restaurant supplies in the next one or two business days.

28. Unless Defendant is enjoined from cutting off Plaintiff's ability to secure food, beverage, and other restaurant supplies from this key vendor, all of these restaurants will need to close down imminently, thereby suffering immediate and irreparable harm, due to loss in traffic and permanent reputational injury.

Further Affiant sayeth not.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

By: _____
Michael Nakleh

STATE OF California §
§
COUNTY OF Los Angeles §

BEFORE ME, the undersigned authority on this day personally appeared Michael Nakleh, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged and swore to me that the foregoing facts are true and correct.

Given under my hand and seal of office this 06 day of Feb, 2025.

_____
Notary Public in and for the State of California

ALI TAZHIBI
Notary Public - California
Los Angeles County
Commission # 2468499
My Comm. Expires Nov 23, 2027