## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| PROJECT LONESTAR, INC., |  |
| Plaintiff, | Civil Action No.: 3:25-cv-00339-L |
| v. |  |
| AMERICAN DAIRY QUEEN CORPORATION, | Jury Trial Demanded |
| Defendant. |  |

## DEFENDANT AMERICAN DAIRY QUEEN CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant American Dairy Queen Corporation ("ADQ"), by and through its undersigned counsel, hereby submits its Answer, Affirmative Defenses, and Counterclaim to Plaintiff Project Lonestar, Inc.'s ("Lonestar") Verified Petition. Except as expressly admitted below, ADQ denies each and every allegation of the Petition.

### I. Discovery Control Plan and Claim for Relief

1.      ADQ denies that Lonestar is entitled to any of the relief sought in Paragraph 1 of the Petition.

### II. Parties

2.      ADQ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, and therefore denies the same.

3.      ADQ admits that it is incorporated in Delaware, that it has its principal place of business in Bloomington, Minnesota, and that its registered agent in Texas is CT Corporation

System at 1999 Bryan St., Ste. 900, Dallas, TX, 75201. ADQ otherwise states that the allegations in Paragraph 4 state a legal conclusion to which no response is required.

### III. Venue and Jurisdiction

4.      The allegations in Paragraph 4 state a legal conclusion to which no response is required. To the extent a response is required, ADQ denies the allegations in Paragraph 4 of the Petition.

### IV. Background Facts

5.      ADQ denies the allegations in Paragraph 5 of the Petition.

6.      ADQ admits the allegations in Paragraph 6 of the Petition.

7.      ADQ admits that in 2020, Lonestar acquired the franchise rights to multiple Dairy Queen stores in the State of Texas. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 7.

8.      ADQ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore denies the same.

9.      ADQ admits that in September 2024, ADQ considered Lonestar's franchise rights for 36 of its DQ® Restaurants to be terminated based on Lonestar's failure to cure defaults relating to Lonestar's failure to comply with its Facility PRIDE Check obligations and/or Modernization obligations under the Operating Agreements. ADQ further admits that the parties entered into a Mutual Cancellation and Release Agreement (the "MCRA") on September 24, 2024. ADQ otherwise states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 9.

10.     ADQ admits the allegations in Paragraph 10 of the Petition.

11.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same.

12.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same.

13.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same.

14.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same.

15.    ADQ admits that Lonestar notified ADQ that it had located a buyer. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 15.

16.    ADQ admits that on September 25, 2024, ADQ informed Lonestar that ADQ must receive the transfer fee before it could proceed with evaluating the proposed transfer. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 16.

17.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same.

18.    ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same. ADQ denies the remaining allegations in Paragraph 18.

19.    ADQ denies the allegations in Paragraph 19.

20.    ADQ denies the allegations in Paragraph 20.

21.    ADQ admits that on November 15, 2024, Lonestar was behind on its royalty payments. ADQ further admits that it advised Lonestar in November 2024 that ADQ would not continue the transfer process until Lonestar's financial obligations were resolved, and that its failure to meet its financial obligations gave ADQ the right to immediately terminate the franchises

under the terms of the MCRA. Except as expressly stated herein, ADQ denies the remaining allegations in Paragraph 21.

22.    ADQ admits that ADQ and Lonestar's proposed buyer had discussions between November 16 and 19, 2024. Except as expressly stated herein, ADQ denies the remaining allegations in Paragraph 22.

23.    The allegations in Paragraph 23 are vague and ambiguous. To the extent Lonestar is alleging that its proposed buyer reduced its offer to purchase Lonestar's franchise rights as to all Lonestar's DQ® locations, ADQ responds that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Lonestar's proposed buyer's alleged reduction of its offer to purchase the franchise rights in Paragraph 23, and therefore denies the same. ADQ admits that in or about December 2024, Lonestar's proposed buyer notified ADQ that it proposed to purchase only 11 of Lonestar's DQ® locations, and that the purchase price was accordingly reduced. ADQ denies the remaining allegations in Paragraph 23.

24.    ADQ lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 24, and therefore denies the same.

25.    ADQ admits that in or about November 2024, Lonestar's proposed buyer notified ADQ that it proposed to purchase 11 of Lonestar's DQ® locations. ADQ further admits that ADQ advised Lonestar that ADQ would not continue the transfer process until Lonestar's financial obligations were resolved, and that its failure to meet its financial obligations gave ADQ the right to immediately terminate the franchises under the terms of the MCRA. Further answering, ADQ states that the terms of the MCRA speak for themselves, and to the extent the allegations differ, denies the same. ADQ denies the remaining allegations in Paragraph 25.

26.     ADQ lacks knowledge or information sufficient to form a belief as to what Plaintiff believed by January 2025, and therefore denies the same. ADQ admits that it disputed that Lonestar had caught up on its royalty payments by January 2025. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 26.

27.     ADQ admits that on January 30, 2025, it sent Lonestar a Notice of Termination of Franchises relating to 25 of its DQ® locations. ADQ states that the Notice of Termination speaks for itself, and to the extent the allegations differ, denies the same.

28.     ADQ states that the January 30, 2025, Notice of Termination speaks for itself, and to the extent the allegations differ, denies the same. ADQ denies the remaining allegations in Paragraph 28.

29.     ADQ denies the allegations in Paragraph 29.

30.     ADQ denies that Lonestar has been or will be harmed or that any alleged harm was a direct and foreseeable result of ADQ's actions and inaction. The remaining allegations in Paragraph 30 state a legal conclusion to which no response is required. To the extent a response is required, ADQ denies that Lonestar is entitled to any relief.

31.     The allegations in Paragraph 31 state a legal conclusion to which no response is required. To the extent a response is required, ADQ denies that Lonestar is entitled to any relief.

### V. Count One: Breach of Contract

32.     ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

33.     ADQ admits only that Lonestar and ADQ entered into the MCRA that was contractual in nature and the parties had the mutual intent to be bound by its terms. ADQ otherwise states that the terms of the MCRA speak for themselves, and to the extent the allegations differ,

denies the same. Except as expressly admitted herein, ADQ denies the remaining allegations in Paragraph 33.

33. ADQ denies the allegations in Paragraph 34.

35. ADQ denies the allegations in Paragraph 35.

36. ADQ denies the allegations in Paragraph 36.

### V. Count Two: Declaratory Judgment

37. ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

38. ADQ denies that Lonestar is entitled to declaratory judgment as set forth in Paragraph 38 of the Petition.

39. ADQ denies that Lonestar is entitled to any relief.

### VI. Count Three: Tortious Interference with Contract or Prospective Business Relationship

40. ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

41. The allegations in Paragraph 41 state a legal conclusion to which no response is required. To the extent a response is required, ADQ denies the allegations.

42. ADQ denies the allegations in Paragraph 42.

43. ADQ denies the allegations in Paragraph 43.

### VII. Application for Temporary Restraining Order

44. ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

45. ADQ denies that Lonestar is or was entitled to a temporary restraining order or temporary injunction.

46.     ADQ denies the allegations in Paragraph 46.

47.     ADQ denies the allegations in Paragraph 47.

48.     ADQ denies the allegations in Paragraph 48.

49.     ADQ denies the allegations in Paragraph 49.

50.     The allegations in Paragraph 50 state a legal conclusion to which no response is required. To the extent a response is required, ADQ denies the allegations.

### VIII. Request for Temporary Injunction

51.     ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

52.     ADQ denies that a temporary injunction should issue.

### IX. Request for Permanent Injunction

53.     ADQ restates and incorporates by reference herein its responses to the foregoing allegations of the Petition.

54.     ADQ denies that a permanent injunction should issue.

### X. Evidence in Support of Application for Temporary Restraining Order and Application for Temporary Injunction

55.     There are no allegations in Paragraph 55 to which a response is required.

### XI. Conditions Precedent

56.     ADQ denies the allegations in Paragraph 56.

### XII. Attorneys' Fees

57.     ADQ denies that Lonestar is entitled to recover its costs or attorneys' fees.

### XIII. Interest

58.     ADQ denies that Lonestar is entitled to recover prejudgment or post-judgment interest.

## XIV. Prayer

59.     ADQ denies that Lonestar is entitled to any of the relief sought in its prayer.

## AFFIRMATIVE DEFENSES

1.     The claims set forth in Lonestar's Petition fail, in whole or in part, to state a claim upon which relief can be granted.

2.     Lonestar's claims fail, in whole or in part, because ADQ acted reasonably and in good faith at all material times based on all relevant facts and circumstances known by it at the time it so acted.

3.     The claims and relief sought in Lonestar's Petition are barred by the terms of the relevant agreements.

4.     Lonestar's claims fail, in whole or in part, because Lonestar failed to perform all conditions precedent to ADQ's performance or because Lonestar failed to perform or comply with the terms of the agreements between the parties, releasing ADQ from any performance obligations under the agreements.

5.     The claims set forth in Lonestar's Petition are barred, in whole or in part, by the doctrines of estoppel, waiver, or unclean hands.

6.     Lonestar's claims fail because ADQ did not breach or violate its legal duties, if any, owed to Lonestar.

7.     Lonestar's claims fail because ADQ's actions were justified and/or privileged.

8.     Lonestar's claims fail because Lonestar has suffered no compensable damages.

9.     If Lonestar was damaged in any amount, Lonestar has failed to mitigate its damages and, therefore, is barred from recovery, or any award of damages to Lonestar must be proportionately diminished.

8

10.     Lonestar's request for an award of attorneys' fees fails because there is no basis on which Lonestar is entitled to recover such an award from ADQ.

11.     ADQ reserves the right to supplement its affirmative defenses as it continues with its factual investigation of Lonestar's claims or discovery in this matter.

## COUNTERCLAIMS

### I. Introduction

1.     ADQ is the franchisor and owner of the DQ® franchise system. Lonestar is a DQ® franchisee who has owned and operated several dozen DQ® Restaurants in Texas since 2020.

2.     As relevant to this dispute, Lonestar held franchise rights for and operated 39 DQ® Restaurants located in Texas under separate Operating Agreements. In September 2023 and February 2024, ADQ issued separate Notices of Default related to 36 of Lonestar's 39 DQ® Restaurants due to Lonestar's failure to operate and maintain its Restaurants in accordance with ADQ's building, equipment and signage requirements and maintenance schedules and/or that it had failed to modernize its Restaurants as required by its Operating Agreements. Lonestar failed to cure the defaults within the required cure periods and, as a result, ADQ considered Lonestar's franchise rights for each of the 36 Restaurants to be terminated.

3.     In September 2024, in an effort to allow Lonestar to possibly recoup some of its investment in the Restaurants, ADQ agreed to extend the terminations and allow Lonestar the opportunity to sell the Restaurants' business assets pursuant to certain terms and conditions set forth in the parties' Mutual Cancellation and Release Agreement ("MCRA").

4.     On January 30, 2025, ADQ terminated the license and other rights granted to Lonestar under its Operating Agreements for 25 DQ® Restaurants effective immediately, based on Lonestar's failure to meet the requirements of the MCRA. *See* Exhibit A (Notice of Termination

of Franchises). ADQ did not terminate—and has not taken any steps to terminate—the franchise rights for the remaining 11 locations that are subject to the MCRA.

5.      By these Counterclaims, ADQ seeks to recover the more than $1.5 million in Termination Fees Lonestar has failed to pay to ADQ for the Restaurants that were terminated on January 30, 2025, as well as one other DQ® Restaurant formerly owned and operated by Lonestar that was terminated in October 2024. ADQ also seeks to recover damages relating to Lonestar's breaches of the MCRA, including but not limited to by disclosing the confidential terms of the MCRA in its publicly filed Petition.

## II. Parties

6.      Plaintiff Lonestar is a foreign corporation with its principal place of business in Cheyenne, Wyoming. Upon information and belief, Lonestar is incorporated in Wyoming. Elite Restaurant Group Inc. and Elite Ltd. are direct and indirect stockholders of Lonestar.

7.      Defendant ADQ is a Delaware corporation with its principal place of business at 8331 Normal Center Drive, 8000 Tower, Suite 700, Bloomington, Minnesota 55437.

8.      As relevant to this dispute, Lonestar held franchise rights for and operated 39 DQ® Restaurants located in Texas under separate Operating Agreements. The 36 DQ® Restaurants subject to the MCRA are identified by the following DQ® Store Nos.:

- 13384
- 13889
- 13896
- 13902
- 13919
- 14004
- 14024
- 14077
- 14127
- 14133
- 14135
- 14203

- 14208
- 14276
- 14279
- 14281
- 14286
- 14299
- 14303
- 14330
- 14361
- 14364
- 14382
- 14440

- 14456
- 14469
- 14490
- 14541
- 14619
- 14621
- 14643
- 14657
- 14697
- 41390
- 42475; and
- 43885

9.      The three other DQ® Restaurants owned and operated by Lonestar that are not subject to the MCRA are identified as DQ® Store Nos. 14381 (Lufkin), 43919 (Terrell), and 44096 (Pantego).

### III. Jurisdiction and Venue

10.      This action includes claims brought under the Lanham Act, 15 U.S.C. § 1051 *et seq*. Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in this District and division under 28 U.S.C. § 1441(a) because this district and division embrace the place in which the removed action was pending, the 160th Judicial District of Texas, Dallas County, Texas, and a substantial part of the events giving rise to Plaintiff's claims allegedly occurred in this district.

### IV. Factual Background

#### A.  ADQ's Business and Trademarks

12.      The DQ® brand dates back to the 1940s, when McCullough's Dairy Queen formulated the now-famous soft serve ice cream and created the "Dairy Queen" name. Now, ADQ

11

owns the DQ® franchise system and licenses its federally registered trademarks and service marks, including but not limited to the DQ® (Registration No. 960,525), BLIZZARD® (Registration No. 895,139), and DAIRY QUEEN® (Registration No. 728,894) trademarks (the "DQ® Marks"), to franchisees operating more than 7,500 DQ® restaurants across the United States and abroad. These registrations are valid and incontestable within the meaning of 15 U.S.C. § 1065.

13.    Brand uniformity is one of the hallmarks of a franchise system. Every franchised restaurant must appear to customers as part of a unified system, not as an independent enterprise. To that end, ADQ sets system standards for products and services, facilities and premises, and restaurant operations, among other things. ADQ's system standards are set forth in the DQ® System Standards and Operations Manual – United States. Each DQ® franchisee benefits from all other DQ® franchisees having to follow these system standards, because the standards allow the DQ® system to meet customer expectations, ensure consumer safety, and protect the DQ® brand's goodwill.

14.    Uniformity in a franchise system also means a negative experience at one franchise can reverberate through the entire system because customers associate poor product quality, poorly maintained or outdated facilities, and other problems at one franchise with the entire system.

**B.  The Franchise Agreements**

15.    As relevant to this action, Lonestar held franchise rights for and operated 39 DQ® Restaurants located in Texas under separate Operating Agreements.

16.    The Operating Agreements granted Lonestar a license to use ADQ's Marks in connection with each DQ® Restaurant. But the Agreements reserved exclusive ownership over the franchise and its marks in ADQ. *See, e.g.*, Exhibit B at §§ 2, 4 (Store No. 13896-Canadian, TX Operating Agreement); Exhibit C at §§ 2, 3 (Store No. 13919-Cleveland, TX Operating Agreement); Exhibit D at §§ 2, 3 (Store No. 14004-Dayton, TX Operating Agreement).

17.     Upon termination of the license, the Operating Agreements require Lonestar to immediately cease all use of ADQ's Marks.

18.     The Operating Agreements generally require each DQ® Restaurant to comply with the quality standards of operation promulgated by ADQ. Those standards include facility maintenance and, in certain of the Operating Agreements, modernization of the facility and its equipment. *See, e.g.*, Exhibit C at § 5 (Store No. 13896-Canadian, TX Operating Agreement); Exhibit C at § 5 (Store No. 13919-Cleveland, TX Operating Agreement); Exhibit D at § 5 (Store No. 14004-Dayton, TX Operating Agreement).

19.     To ensure franchisees are complying with ADQ's standards of operation, ADQ representatives conduct Facility PRIDE Checks ("FPC") at DQ® Restaurants on at least an annual basis. The FPC identifies critical and non-critical deficiencies in Restaurant facilities and operations.

20.     Where required by the applicable Operating Agreement, franchisees are also required to modernize restaurant facilities to meet ADQ's specifications and standards.

**C. Lonestar's Failure to Operate, Maintain, and Modernize Its Restaurants in Accordance with ADQ's System Standards and Its Contractual Requirements.**

21.     In September 2023 and February 2024, ADQ issued separate Notices of Default for 36 of Lonestar's 39 DQ® Restaurants due to Lonestar's failure to comply with its Facility PRIDE Check obligations and/or Modernization obligations under the Operating Agreements. *See* Exhibit E (Sept. 27, 2023 Notice of Default); Exhibit F (Feb. 28, 2024 Notice of Default for Store No. 14004-Dayton, TX).

22.     The Notices of Default explained that Lonestar had failed to operate and maintain its Restaurants in accordance with ADQ's building, equipment and signage requirements and

maintenance schedules and/or that it had failed to modernize its Restaurants as required by its Operating Agreements.

23.     For example, the September 2023 Notice of Default noted numerous deficiencies at DQ® Store Nos. 13896 and 13919, including but not limited to:

(a) DQ® Store No. 13896 (Canadian): damaged walls, damaged roof, damaged laminate, uneven/damaged paint throughout the store, stained interior ceiling tiles, damaged signage, missing drive thru window speakers, out-of-date fire suppression system, and large pot holes in the parking lot.

(b) DQ® Store No. 13919 (Cleveland): damaged/broken food preparation equipment, non-approved appliances, chipping paint, ceiling stains, faded and worn floors, damaged/rusted vents, and out-of-date fire suppression system and fire extinguishers. *See* Exhibit E at 6, 9 (Sept. 27, 2023 Notice of Default).

24.     Also by way of example, the February 2024 Notice of Default for DQ® Store No. 14004 (Dayton) concerned Lonestar's failure to complete an estimated $113,338.55 in modernization work by December 31, 2023, including but not limited to new cabinetry, repainting or tiling interior and exterior walls, replacing seating and tables, new lighting, new dining room floors, and replacing food storage and preparation equipment. Exhibit F at 4-33 (Feb. 28, 2024 Notice of Default for Store No. 14004-Dayton, TX).

25.     Lonestar failed to cure the defaults within the required cure periods and, as a result, ADQ considered Lonestar's franchise rights for each of the 36 Restaurants to be terminated.

26.     After months of negotiations, in September 2024, in an effort to allow Lonestar to possibly recoup some of its investment in the Restaurants, ADQ agreed to extend the terminations

and allow Lonestar the opportunity to sell the Restaurants' business assets pursuant to certain terms and conditions set forth in the parties' MCRA.

**D.  Lonestar Identifies a Buyer for 11 of the DQ® Restaurants.**

27.     Soon after the MCRA was signed, Lonestar notified ADQ that it had identified a proposed buyer for each of the 36 Restaurants that were subject to the MCRA.

28.     Consistent with its standard transfer procedures as set forth in DQ® System Standards and Operations Manual – United States ("SSOM"), ADQ notified Lonestar that it must receive the transfer fee before it would proceed with evaluating the proposed transfer. ADQ did not receive a transfer fee in connection with Lonestar's proposed transfer until on or about October 20, 2024.

29.     ADQ also notified Lonestar, repeatedly, that the transfer process would be on hold and would not move forward until Lonestar submitted all outstanding sales reporting and fees and provided authorization for ADQ to draft royalty fees from Lonestar's bank account.

30.     In or about November 2024, Lonestar's potential buyer notified ADQ that it had to terminate the deal.

31.     In or about December 2024, Lonestar's potential buyer notified ADQ that it planned to acquire just 11 of the 36 Restaurants subject to the MCRA, and that it would no longer be acquiring the remaining 25 Restaurants.

32.     In the month that followed, Lonestar failed to identify any other prospective buyer for the remaining 25 Restaurants.

**E. Lonestar's Failure to Timely Submit All Store Monthly Reports and Accompanying Fees During the Term of the MCRA**

33.     In December 2024, ADQ informed Lonestar that it had several outstanding fees from August, September, and October, and that Store Monthly Reports for November were also overdue. ADQ requested full payment by December 20, 2024.

34.     By December 20, 2024, Lonestar had not paid its outstanding fees. In January 2025, ADQ reported to Lonestar that it still had outstanding fees and Store Monthly Reports. ADQ requested payment for all outstanding fees and the submission of all outstanding Store Monthly Reports by January 17, 2025.

35.     By January 17, 2025, Lonestar had still not paid its outstanding fees or submitted its outstanding Store Monthly Reports.

**F. ADQ Terminates 25 of Lonestar's DQ® Restaurants Effective January 30, 2025**

36.     On January 30, 2025, ADQ terminated the license and other rights granted to Lonestar under its Operating Agreements for the 25 DQ® Restaurants for which Lonestar had not identified a proposed buyer, based on Lonestar's failure to meet the requirements of the MCRA. *See* Exhibit A (Notice of Termination of Franchises).[1]

37.     The following 25 Restaurants were subject to the January 30, 2025, termination notice:

- 13384
- 13889
- 13896
- 13902
- 13919
- 14004

- 14024
- 14077
- 14127
- 14135
- 14203
- 14276

- 14281 (in error)
- 14286
- 14299
- 14361
- 14440
- 14456

---

[1] The January 30, 2025, Notice of Termination inadvertently listed the ***Huntsville*** location (Store No. 14281) rather than the ***Huntington*** location (Store No. 14279). Lonestar did not alert ADQ to the error, and ADQ did not discover the error, until February 24, 2025.

- 14469
- 14541
- 14619

- 14657
- 14697
- 42475

- 43885

### G. **ADQ Has not Terminated or Otherwise Interfered with the Operation of the Other 11 Lonestar DQ® Restaurants.**

38.     ADQ did not terminate—and has not taken any steps to terminate—the franchise rights for the remaining 11 locations that were not identified in the January 30, 2025 Notice of Termination that are subject to the MCRA.

39.     Indeed, the January 30, 2025, Notice of Termination of Franchises specifically states (emphasis in the original): "Note that this terminates only your rights to operate these Restaurants. Your Agreements remain in effect for any other locations currently being operated under the Agreements or not included on the Exhibit." Exhibit A.

### H. **Lonestar Has Failed to Pay all Termination Fees.**

40.     Lonestar is obligated to pay a Termination Fee to ADQ within 30 days of the January 30, 2025, Termination Date. The total amount due for all Restaurants listed in the January 30, 2025, not including Store No. 14281 (Huntsville) that was inadvertently included in the Notice, is $1,496,957.00. To date, Lonestar has not paid this Termination Fee.

41.     Separate from the stores governed by the MCRA, ADQ also issued a termination on October 1, 2024, another store formerly owned and operated by Lonestar, Store No. 14381 (Lufkin). Lonestar had previously closed this location following a fire, and ADQ terminated the store when it did not reopen. *See* Exhibit G (Confirmation of Termination for Store No. 14381-Lufkin, TX).

42.     With respect to Store No. 14381 (Lufkin), Lonestar was obligated to pay a Termination Fee to ADQ within 30 days after the October 1, 2024, Termination Date. Although the total amount due was $100,113.65, ADQ agreed to accept $60,000 as payment in full in light

17

of the surrounding circumstances. *Id*.; *see also* Exhibit H (Store No. 14381-Lufkin, TX Operating Agreement).

43.     To date, Lonestar has not paid the Termination Fee for Store No. 14381 (Lufkin).

<div align="center">

**V. Causes of Action**

</div>

<div align="center">

**COUNT 1: BREACH OF CONTRACT (OPERATING AGREEMENTS FOR THE 25 RESTAURANTS TERMINATED JANUARY 30, 2025)**

</div>

44.     ADQ realleges the preceding paragraphs of these Counterclaims as if fully set forth herein.

45.     The Operating Agreements are enforceable contracts between ADQ and Lonestar. ADQ has fully complied with all of its obligations under the Operating Agreements.

46.     The Operating Agreements require each DQ® Restaurant to comply with the quality standards of operation promulgated by ADQ. These standards include facility maintenance and, in some of the Operating Agreements, modernization of the facility and its equipment. Lonestar failed to comply with these obligations for each of the 25 DQ® Restaurants.

47.     ADQ lawfully terminated the Operating Agreements identified in the January 30, 2025, Termination Notice effective January 30, 2025.

48.     The Operating Agreements set forth post-termination duties with which Lonestar must comply, including but not limited to, requiring Lonestar to pay to ADQ any applicable Termination Fees within 30 days of the January 30, 2025, Termination Date. Lonestar's post-termination obligations survive the termination of the Operating Agreements.

49.     The total amount due for all Restaurants identified in the January 30, 2025, Termination Notice, not including Store No. 14281 (Huntsville) that was inadvertently included in the Notice, is $1,496,957.00.

50.     Lonestar materially breached the Operating Agreements by failing to pay the Termination Fees.

51.     ADQ has suffered and is entitled to damages of at least $1,496,957.00, or an amount to be determined at trial, arising from Lonestar's breaches of the Operating Agreements.

## COUNT 2: BREACH OF CONTRACT (MCRA)

52.     ADQ realleges the preceding paragraphs of these Counterclaims as if fully set forth herein.

53.     The MCRA is an enforceable contract between ADQ and Lonestar. ADQ has fully complied with all of its obligations under the MCRA.

54.     Lonestar failed to comply with and materially breached its obligations under the MCRA, including but not limited to by disclosing the confidential terms of the MCRA in its publicly filed Petition.

55.     ADQ has suffered and is entitled to damages in an among to be determined at trial arising from Lonestar's breaches of the MCRA.

## COUNT 3: DECLARATORY JUDGMENT

56.     ADQ realleges the preceding paragraphs of these Counterclaims as if fully set forth herein.

57.     As described in the preceding paragraphs, an actual and justiciable controversy exists between ADQ and Lonestar with respect to their rights and obligations under the MCRA.

58.     ADQ has complied with all its obligations under the MCRA.

59.     Lonestar failed to comply with its obligations under the MCRA.

60.     Therefore, ADQ seeks entry of judgment pursuant to 18 U.S.C. § 2201(a) declaring that:

(a)     The MCRA is a valid and enforceable contract.

(b)    Lonestar failed to satisfy its obligations under the MCRA.

(c)    ADQ had the right to terminate, and ADQ validly terminated, the Operating Agreements for the 25 Restaurants identified in the January 30, 2025 Notice of Termination, and Lonestar's rights thereunder, as of January 30, 2025.

## COUNT 4: BREACH OF CONTRACT (OPERATING AGREEMENT FOR DQ® STORE NO. 14381)

61.    ADQ realleges the preceding paragraphs of this Counterclaim as if fully set forth herein.

62.    The Operating Agreement for DQ® Store No. 14381 (Lufkin) is an enforceable contract between ADQ and Lonestar. ADQ has fully complied with all of its obligations under this Operating Agreement.

63.    Lonestar closed down DQ® Store No. 14381 (Lufkin) on or about August 5, 2022, after it suffered a fire.

64.    ADQ lawfully terminated the Operating Agreement and Lonestar's license to use the DQ® Marks for DQ® Store No. 14381 (Lufkin) on October 1, 2024.

65.    The Operating Agreement for DQ® Store No. 14381 (Lufkin) set forth post-termination duties with which Lonestar must comply, including but not limited to, requiring Lonestar to pay to ADQ any applicable Termination Fee within 30 days of the October 1, 2024, Termination Date. Lonestar's post-termination obligations survive the termination of the Operating Agreement.

66.    The total amount due is $60,000.00.

67.    Lonestar materially breached the Operating Agreement for DQ® Store No. 14381 (Lufkin) by failing to pay the Termination Fee.

68.     ADQ has suffered and is entitled to damages of at least $60,000.00, or an amount to be determined at trial, arising from Lonestar's breaches of the Operating Agreement for Store No. 14381 (Lufkin).

## VI. Prayer for Relief

**WHEREFORE**, ADQ respectfully requests the Court to enter judgment as follows:

(1)     An order declaring that the Operating Agreements for the 25 DQ® Restaurants identified in the January 30, 2025 Notice of Termination were properly terminated effective January 30, 2025;

(2)     Monetary damages of at least $1,556,957.00;

(3)     ADQ's reasonable costs and attorneys' fees;

(4)     Prejudgment interest on any monetary award made part of the judgment against Lonestar; and

(5)     Such other relief as the Court may deem just and proper.

## VII. Jury Demand

Pursuant to Federal Rule of Civil Procedure 38(b), ADQ demands a jury trial on all issues so triable.

Dated: <u>March 3, 2025</u>                    <u>/s/ Lauren W. Linderman</u>

**FAEGRE DRINKER BIDDLE & REATH
LLP**

Susan E. Egeland (State Bar No. 24040854)
2323 Ross Ave., Suite 1700
Dallas, Texas 75201
(469) 357-2500 (Telephone)
(469) 327-0860 (Fax)
susan.egeland@faegredrinker.com

Lauren W. Linderman (admitted *pro hac vice*)
Drew M. Horwood (admitted *pro hac vice*)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000 (Telephone)
(612) 766-1600 (Fax)
lauren.linderman@faegredrinker.com
drew.horwood@faegredrinker.com

Leah S. Chrisbacher (*pro hac vice* forthcoming)
1800 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 203-4000 (Telephone)
(310) 229-1285 (Fax)
leah.chrisbacher@faegredrinker.com

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

 This is to certify that a true and correct copy of the foregoing document has been served to all counsel of record in accordance with the Federal Rules of Civil Procedure on March 3, 2025 via ECF Notification.

<div align="center" style="margin-left:40%">

*/s/ Lauren W. Linderman*
LAUREN W. LINDERMAN

</div>